IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| GARY LEE ENZLER, | CV 16-100-H-DLC-JTJ |
| Petitioner, | |
| vs. | FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE |
| DOUGLAS FENDER; ATTORNEY GENERAL OF THE STATE OF MONTANA, | |
| Respondents. | |

This case comes before the Court on Petitioner Gary Lee Enzler's petition
for writ of habeas corpus. Enzler is a state prisoner proceeding with counsel.

## I. Preliminary Review

Before the State is required to respond, the Court must determine whether "it
plainly appears from the petition and any attached exhibits that the prisoner is not
entitled to relief." Rule 4(b), Rules Governing § 2254 Cases in the United States
District Courts. A petitioner "who is able to state facts showing a real possibility
of constitutional error should survive Rule 4 review." *Calderon v. United States
Dist. Court*, 98 F.3d 1102, 1109 (9th Cir. 1996) ("*Nicolas*") (Schroeder, C.J.,
concurring) (referring to Rules Governing § 2254 Cases). But the Court should
"eliminate the burden that would be placed on the respondent by ordering an

1

unnecessary answer."  Advisory Committee Note (1976), Rule 4, § 2254 Rules.

## II. Background

In 2011, Enzler pled guilty in Montana's First Judicial District Court, Lewis and Clark County, to four counts of sexual assault.  Pursuant to a plea agreement, the State dismissed one count of sexual intercourse without consent.  Before sentencing, Mr. Tracy Vaughn and Dr. Bowman Smelko conducted psychosexual evaluations to assess Enzler's treatment needs and the risk he would reoffend.  On December 9, 2011, the Honorable Jeffrey Sherlock sentenced Enzler to serve a total of 45 years in prison, with 29 of those years suspended.  *See* Case Register Report (Doc. 13-4 at 2–5).

Between September 2012 and September 2013, Enzler, acting *pro se*, filed a few documents in the trial court but received no response.  In November 2013, he filed a petition for writ of habeas corpus in the Montana Supreme Court.[1]  The court denied it on November 26, 2013.  *See Enzler v. State*, No. OP 13-0746 (Mont. filed Nov. 7, 2013).  Enzler petitioned for an out-of-time appeal in December 2013.  The court denied it on January 7, 2014.  *See State v. Enzler*, No. DA 13-0843 (Mont. filed Dec. 19, 2013).

On January 17, 2014, Enzler moved to withdraw his guilty plea in the trial

---

[1]  The petition and other documents of the Montana Supreme Court are available from the court's website, https://supremecourtdocket.mt.gov (accessed Sept. 5, 2018).

2

court.  Judge Sherlock appointed attorney Michael Kakuk to represent Enzler.  In August 2014, Kakuk moved the trial court to declare Enzler unfit to proceed and to transfer him to the State Hospital at Warm Springs for observation, evaluation, and treatment.  *Cf.* July 2014 Zook Report (Doc. 13-2) at 1–4.  Judge Sherlock issued the order.  For unknown reasons, the Department of Corrections refused to comply with it, and for unknown reasons, no further action was taken on the issue.  *See* Second Am. Pet. (Doc. 11) at 3 ¶¶ 4–5; *see also* Appellant Br. (Doc. 13-3) at 5–6, *Enzler*, No. DA 15-0495 (Mont. Aug. 5, 2016).

On May 4, 2015, Judge Sherlock held an evidentiary hearing on Enzler's motion to withdraw his guilty plea.  Kakuk sought to show Enzler was incompetent when he pled guilty.  Enzler attended but did not testify.  A friend of his, Kathleen Sullivan, testified about her observations of Enzler in 2011, and Dr. Donna Zook testified about her retrospective evaluation, in 2014, of Enzler's competence when he pled guilty in 2011.  The State called Dr. Smelko and both trial counsel to testify.  *See* Evid. Hr'g Tr. (Doc. 13-8) at iii.  After briefing, Judge Sherlock found Enzler was competent when he pled guilty and denied Enzler's motion to withdraw his guilty plea.  *See* Order Denying Mot. to Withdraw Plea (Doc. 13-5 at 644–649) ("Sherlock Order").

Enzler appealed, asserting the District Court violated his right to due process by holding the evidentiary hearing while he was unfit to proceed.  The Montana

3

Supreme Court refused to consider that issue because Enzler did not present it in the trial court.  The court affirmed the trial court's denial of Enzler's motion to withdraw his guilty plea on the grounds that the 2011 plea colloquy demonstrated the voluntariness of the plea and because "the presentence psychological evaluations of Enzler both showed he was competent at the time of his guilty plea." Order at 3 ¶ 7, 4 ¶ 9, *Enzler v. State*, No. DA 15-0495 (Mont. June 20, 2017) ("Mont. S. Ct. Order").  Enzler unsuccessfully petitioned for rehearing.  *See* Order at 1, *Enzler*, No. DA 15-0495 (Mont. July 19, 2017).

While the postconviction appeal[2] was pending, Enzler, acting *pro se*, mailed to this Court a voluminous, frequently illegible screed that seemed to allege his custody was unconstitutional.  The Court construed the document as a petition for writ of habeas corpus and stayed the matter pending disposition of the state postconviction appeal.  *See* Order (Doc. 3) at 1–4.  On August 10, 2017, the Court lifted the stay and appointed counsel to represent Enzler.

Represented by Assistant Federal Defender David Ness, Enzler filed an amended petition and, on December 20, 2017, a second amended petition (Doc. 11).  On January 3, 2018, Enzler filed the state court record (Doc. 13).

---

[2]  The Court will follow Enzler in describing his motion to withdraw his guilty plea as a "postconviction" matter because Enzler filed the motion after his conviction became final.  *See* Mont. Code Ann. § 46-16-105(2) (2013).  Enzler did not file a petition for postconviction relief. *See id.* § 46-21-101.

### III.  Claims and Analysis

The Second Amended Petition contains two claims.  First, Enzler asserts that his trial counsel were ineffective because they coerced him to plead guilty ("ineffective assistance claim").  Second, he avers that he was in fact incompetent when he pled guilty ("competency claim").

Their order is reversed here, but both claims are addressed.

### A.  Competency

This claim might be procedurally barred, as Enzler did not fairly present it in the state courts.  *See* 28 U.S.C. § 2254(b)(1)(B)(i); *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *Gray v. Netherland*, 518 U.S. 152, 161–63 (1996); *Davis v. Silva*, 511 F.3d 1005, 1009 (9th Cir. 2008); *see also* Reply at 4, *Enzler*, No. DA 15-0495 (Mont. filed Mar. 15, 2017) (conceding that Enzler "could not successfully challenge the district court's denial of his motion to withdraw plea based upon the present record.").  But it is more efficient to address the merits. *See, e.g.*, 28 U.S.C. § 2254(b)(2); *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997).

"[T]he standard for competence to stand trial is whether the defendant has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has 'a rational as well as factual understanding of the proceedings against him.'"  *Godinez v. Moran*, 509 U.S. 389, 396 (1993) (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam)).  A competent plea

is not the same thing as a voluntary plea.  "The focus of a competency inquiry is the defendant's mental capacity; the question is whether he has the *ability* to understand the proceedings.  The purpose of the 'knowing and voluntary' inquiry, by contrast, is to determine whether the defendant actually *does* understand the significance and consequences of a particular decision and whether the decision is uncoerced."  *Moran*, 509 U.S. at 401 n.12 (emphases in original).

### 1. Enzler's First Competency Evaluation

Enzler's federal petition misstates the timing of his competency evaluations.[3]  He states that his trial counsel:

> did not believe that he was incompetent.  As they both testified during state postconviction proceedings, Enzler had been evaluated by two mental health professionals and neither found any reason to question his competency.  Their evaluations, however, were not designed to delve into Enzler's competency.  Both evaluators were asked to conduct a psychosexual evaluation.  It was not until the post-conviction proceedings that an expert was hired to specifically evaluate Enzler's competency.

Second Am. Pet. (Doc. 11) at 22–23.

Enzler did undergo two presentence psychosexual evaluations by Tracy Vaughn and Dr. Smelko.  And trial counsel, based on their interactions with

---

[3]  Habeas counsel appears be misled by the Montana Supreme Court's mistaken reference to two "presentence psychological evaluations" that "showed [Enzler] was competent."  Mont. S. Ct. Order at 4 ¶ 9.  In fact, the only presentence psychological evaluations available to the trial court were psychosexual evaluations.

Enzler, believed he was competent and did not seek an expert opinion before he pled guilty.  Enzler is also correct that a psychosexual evaluation does not assess fitness to proceed.  *See, e.g.*, *Drope v. Missouri*, 420 U.S. 162, 176 (1975); Mont. Code Ann. §§ 46-14-101(1)(a)(i), (2), 46-23-509; *see also* Evid. Hr'g Tr. (Doc. 13-8) at 90:2–13, 97:18–23, 100:16–101:10 (Dr. Smelko explains difference between psychosexual evaluation and competency and mental state evaluation).

But the last sentence of Enzler's description is incorrect.  The timing is not entirely clear, but shortly before or after Enzler pled guilty, in October 2011, trial counsel asked Dr. Smelko to evaluate Enzler's competency as well as his mental state at the time of the offenses.  Dr. Smelko found Enzler competent.  Because a report explaining this finding would "not assist" Enzler's counsel, counsel did not ask him to write one, but he did write a report about Enzler's mental state at the time of the offense.  At the postconviction hearing, Dr. Smelko explained his opinion of Enzler's competency in detail.  *See* Evid. Hr'g Tr. at 96:24–104:19 (Smelko), 122:21–123:19 (Penner), 130:19–131:23 (Abbott); *see also* Smelko Report at 1, 8–9 (Doc. 13-4 at 34, 41–42).  Judge Sherlock's findings reflect these facts.  *See* Sherlock Order at 4 (Doc. 13-5 at 647–648).

Dr. Smelko's evaluation was not the only contemporary evidence of Enzler's competency.  Trial counsel found Enzler "was very distraught and outraged at the charges" and "kind of meandered, you know, going a little bit off kilter, but he

7

would always ultimately answer the questions" they were asking, and he assisted in his own defense. *See, e.g.*, Evid. Hr'g Tr. at 111:19–112:12, 113:19–114:24, 129:13–131:23.

As both the trial court and the Montana Supreme Court later pointed out, Enzler's behavior and statements at the change of plea hearing indicated he was competent. *See* Sherlock Order at 3 (Doc. 13-5 at 646); Mont. S. Ct. Order at 4 ¶ 9; Change of Plea Tr. (Doc. 13-7 at 4:1–13:18). As late as his Montana Supreme Court petition for an out-of-time appeal in December 2013, his *pro se* submissions did not suggest incompetency. The issue arose for the first time about three years after he was sentenced.

Enzler questions the state courts' factual findings on the grounds that he was not competent to testify at the postconviction evidentiary hearing. *See* Second Am. Pet. at 16; *see also* 28 U.S.C. § 2254(e)(1); *Murray v. Schriro*, 745 F.3d 984, 999 (9th Cir. 2014) (discussing *Taylor v. Maddox*, 366 F.3d 992, 999–1000 (9th Cir. 2004)). But even assuming Enzler was incompetent at the time of the postconviction proceedings (without a state court's finding to that effect), there is no reason to suppose his testimony could prove he was incompetent when he pled guilty. And, as explained below, the evidence he presented to show he was incompetent when he pled guilty does not warrant further proceedings in this Court.

### 2.  Dr. Zook's Report and Testimony

In January 2014, Judge Sherlock found reason to question Enzler's ability to represent himself in postconviction litigation.  New counsel appeared and obtained a retrospective competency evaluation from Dr. Donna Zook.

### a.  Standard Employed

Dr. Zook determined whether Enzler "had the capacity to 'act with knowledge and purpose' at the time of the Change of Plea."  She concluded that he did not, "due to not being capable of forming the mental state necessary to make the plea."  December 2014 Zook Report ("Zook Report") at 1, 3 (Doc. 13-4 at 44, 46).

"Knowingly" and "purposely" are elements of criminal offenses under Montana law.  *See* Mont. Code Ann. §§ 45-2-101(35), (65), 46-14-101(1)(a)(ii), (2), -102 (2017).  These elements are not relevant to or mentioned in the Montana statutes defining fitness to proceed.  *See id.* §§ 46-14-101(1)(a)(i), (2), -103.

Dr. Zook's written report discussed Enzler's ability to appreciate the significance of the rights he waived by pleading guilty, his independence of thought, whether he could "give informed consent to a plea," his ability to differentiate his own best interests from what counsel advises and to "fully appreciate" the long-term consequences of a decision to plead guilty, and whether Enzler "mean[t] to agree" to change his plea rather than going to trial.  Dr. Zook

9

found that "despite having an <u>understanding</u> of the adversarial and legal process,
Mr. Enzler was most likely unable to <u>fully appreciate the magnitude or potential
consequences</u> of the legal proceeding or adversarial process."  Zook Report at 3
(Doc. 13-4 at 46) (underlining in original).

Dr. Zook's observations might be relevant to whether Enzler actually *did*
understand the significance and consequences of the decision to plead guilty, *see
Moran*, 509 U.S. at 401 n.12, but she was not asked to opine on that issue.  Her
observations do not address Enzler's "'ability to consult with his lawyer with a
reasonable degree of rational understanding'" and "'rational as well as factual
understanding of the proceedings against him.'"  *Id*. at 396 (quoting *Dusky*, 362
U.S. at 402).  Her written report is not persuasive evidence of Enzler's
incompetence three years earlier, when he pled guilty.

### b.  Factual Basis

In both her written report and in her hearing testimony, Dr. Zook asserted
that Enzler was suffering from a "delusion":

Prosecutor:   And you indicated that he didn't understand the
              consequences of his change of plea.  And what specific
              information are you relying on to make that statement?

Dr. Zook:     Did I say not understand?  He has an understanding of
              the adversarial legal process, so he knows there's two
              sides to the case.  And he knows what the Judge does.
              He knows what the bailiff does.  He knows what you do,
              what his attorney does.

Prosecutor:    Correct.

Dr. Zook:    But most likely he's unable to fully appreciate the magnitude or potential consequences.

       And I think, for me, the key word is appreciate. And that means reasoning, reasoning through something to know what the outcome could be, what does it mean, what would be the potential aftereffects.

Prosecutor:    Okay.

Dr. Zook:    And it's necessary in terms of making a realistic decision.

. . .

       I don't think he appreciated the finality of this. Again, I'm trying to make sense of nonsense, and you can't.

       When—let's see.  First of all, when his—I do believe his attorneys were trying to explain to him that this plea means instead of 50 years, you'll have ten, or whatever it is. . . .  When you don't go to trial, you not [sic] going to have a jury, you're not going to be able to defend yourself, no witnesses.  You're not going to be able to cross—you know, question them.  All the good stuff that comes with our judicial system.

       You can tell him that, but what makes it not click for him is the fact that his delusion is so set that what you say doesn't impact him, doesn't mean anything to him, because there's a block, and that's the delusion.

Prosecutor:    What's his delusion?

Dr. Zook:    . . . [T]hat he knows the truth and that all he has to do is just tell the parents the truth—the truth, and it will all be over.

. . .

| | |
|---|---|
| Prosecutor: | Is it possible that he has buyer's remorse for changing his plea and admitting what he did and just doesn't like being in prison? |
| Dr. Zook: | It's possible.  But it doesn't fit with the narrative of all of his letters.  It doesn't fit with what—even the others, the—Dr. Smelko and Mr. Vaughn said. |

. . .

| | |
|---|---|
| Prosecutor: | And isn't it pretty common for sex offenders to rationalize their behavior, for example, blaming it on the victim? |
| Dr. Zook: | Absolutely.  But in this case I'm not seeing that. |
| Prosecutor: | Could not his—his theory, that if only he could talk to the parents and explain to them what happened, they would understand be an example of a rationalization? |
| Dr. Zook: | No.  In this case it's delusional. |

Evid. Hr'g Tr. (Doc. 13-8) at 69:18–70:11, 71:4–25, 72:12–18, 73:14–22.

Belief that a guilty plea could be undone simply by talking with the victims'

parents, or a delusion-related inability to understand the consequences of a guilty

plea, would certainly suggest incompetence.  And Dr. Zook pointed to letters

showing Enzler was disorganized, preoccupied with his property, and angry.  *See,*

*e.g.*, Evid. Hr'g Tr. at 51:12–54:10; Pet'r Ex. C (Doc. 13-4 at 48–65, 155–156).

But Dr. Zook's conclusions are simply not supported by the record.  Dr.

Zook asserted that Enzler "most likely was unable to adequately communicate with

12

his attorneys in a consistent, rational and relevant manner" and "most likely was unable to relate with his attorneys due to lack of trust, delusions of grandiosity, and delusions of persecution," Zook Report at 2 (Doc. 13-4 at 45), but she did not speak with Enzler's counsel, *see* Evid. Hr'g Tr. (Doc. 13-8) at 61:23–62:4.  She also did not speak with Dr. Smelko or Mr. Vaughn, *see id.* at 60:18–61:22, who, like counsel, interacted with Enzler in 2011.  She relied on her interviews with Enzler in 2014 and review of "over 150 pages of Mr. Enzler' s handwritten letters and 40 pages of court documents and discovery."  Zook Report at 2 (Doc. 13-4 at 45).

Several of those letters demonstrate Enzler's crystal-clear understanding that his guilty plea would have long-term, serious consequences.  For instance, in August 2011, several weeks before he moved to change his plea on September 27 and pled guilty on October 7, *see* Trial Court Register (Doc. 13-3) at 3–4 Entries 48, 52, Enzler wrote to his brother:

> I can't "start over" like you, especially due to the charges.  On top of that, I don't have your intelligence nor ingenuity.
> . . .
>      When I do get out—if no SS/DI—I am kerfucked re: charges, no one's gonna employ me.  So beyond what I know I can do w/ what I've got – impossible to start over on the outside.

Pet'r PCR Ex. C[4] (Doc. 13-4 at 71).

---

[4]  Enzler's counsel introduced the letters quoted here at the postconviction hearing,

13

On or about September 21, 2011, he wrote:

> Kathleen (you were) was right.  If I go to trial + lose, I'll lose
> everything.  In so doing – I'd get to die twice.
>> I'd get "life" + then lose everything I've worked for.  Even if I
> was to ever get out, I would not have anything left.
> . . .
>> If those people <u>want</u> to believe I went that far:  fine, fuck 'em
> anyway.  I'll get a prison tatt that honors that just to piss them +
> anyone else off.

Pet'r PCR Ex. C (Doc. 13-4 at 76, 77).

About the same time, in another letter to his family, he wrote:

> Sure – taking the plea makes me look guilty.  I don't give a shit ANY
> MORE.  I WILL <u>never</u> be the person I was again.
> . . .
>> Just remember this:  I was wasn't [sic] really planning on
> <u>EVER</u> gettin' married in this life anyway.
>> But <u>now</u>?  Yeah – fuck.  ARE you kidding me?!?  I am <u>NEVER</u>
> going to have children with this looming over my head.  I'll be on
> probation till I'm 86 or so.

Pet'r PCR Ex. C (Doc. 13-4 at 84, 85).

After he pled guilty, in November 2011, Enzler wrote to his friend Kathleen:

> I <u>can't</u> change my plea.  Not that I won't; my <u>attorney's</u> [sic] said –
> "<u>not</u> without just cause".  I can't tell the truth; that's it.
>> <u>None</u> of this can be brought up!  If you take the stand on my
> behalf – you can't bring up anything <u>contrary</u> to me being guilty.
> . . .
>> I want not, but will stand there in open court + lie on myself
> about what didn't happen so these kids can sit there in private + not

---

describing them as "letters written by the defendant contemporaneous to him changing his plea."
Hr'g Tr. (Doc. 13-8) at 5:17–6:2.  Enzler prepared multiple more or less identical drafts of
several letters, so much of the material in the exhibit is repetitive.  *See, e.g.*, Pet'r PCR Ex. C
(Doc. 13-4 at 59–100).

tell the truth about what they were actually doing; what was truly going on.

       Yes – absolutely <u>my</u> fault – A) Finding out; [victim] + [victim] – <u>not</u> letting parents know.  B.)  Letting [victim], [victim] + [victim] use gel whenever w/o parents knowledge  C.) Allowing [victim] after "A.)" to freely use the gel.  D.)  In doing nothing + letting more kids to use – "encouraging" him + them to do so.  E.) Touching [victim] – though out of a dead sleep – no excuse.  F.) Not doing the right thing after "E.)" – talking to [victim] in stead of . . .  G.) letting more + more kids use the gel; regardless of the age/parents

. . .

       [Victim] is the only one I touched. –

. . .

       All I wanted was for <u>you</u> (parents/fam's) to know the truth <u>before</u> I stood in open court + admitted to what I didn't do to <u>preserve</u> what innocence [sic] and posterity the children have.  I would have done so, w/ or w/o the <u>truth</u> being known in doing so.

Pet'r Ex. C (Doc. 13-4 at 189, 190–191).  Just before sentencing, he wrote:

       Yes – I did wrong.  I <u>am</u> sorry - <u>you</u> know that.

       Yes – these parents believe their kids; their <u>right</u>; but in not tracking the truth – THEIR <u>RESPONSIBILITY</u>. . . .

       This Thursday I'm not going to be able or even <u>capable</u> of showing any "emotion" nor "apologize" for <u>crimes</u> I <u>didn't</u> commit.  If that makes me "heartless;" so-be-it.

. . .

       P.S.  You <u>can</u> <u>not</u> expect these parents, this society + certainly <u>not</u> these powers that be; if/when these children finally tell the truth; to reverse <u>any</u> <u>thing</u>.  I don't know who this "started" with – parents – children – both – : who's not/part of it. – <u>A mess</u>.

Pet'r PCR Ex. C (Doc. 13-4 at 219, 220).

And in December 2011, Enzler dictated to his cellmate:

       I want <u>nothing</u> but  ^the^  truth to be known; ^me^  punished – sure – for my responsibility and culpability.

       In the end – either way – I hold no grudge (why would I?).

^Christian or not.^

Not against parents that  ^believe their children +^  think I did
these things.  ^Not^  Against children either by fear or control for
what was  ^(+still may be)^  truely [sic] going on;  All my fault  ^for
lettin' the snowball continue,^  forgiveness need not be given,  only
understood  applied, do to [sic] my <u>not</u> disclosing what these kids
where [sic] doing, but more importantly what I was allowing +  ^in^
doing so; encouraging.

My IRRESPONSIBILITY!!  To all caught in this whirlwind;
nothing to forgive.

. . .

. . . Unless all those involved; the kids fess up + tell the truth +
the parents learn the truth I am not interested in anything else.

This is + will be entirely up to anyone  ^+ everyone^  envolved
[sic]; no public "arena."  We may (even) discover if + who is
[scribble] actually molesting [victim] + [victim], + "?"  [scribble]
[victim].

Pet'r PCR Ex. C (Doc. 13-4 at 236, 242, 243) (insertions in Enzler's handwriting

designated by ^ marks).

Enzler's letters around the time of his guilty plea do not say "that all he has

to do is just tell the parents the truth . . . and it will all be over."  They say he

believed he would be convicted at trial and chose to plead guilty to limit the time

he would spend in prison, that he decided to persist in that plea even while

protesting his fate to his friends, and that he believed the truth might one day come

out, but not in the "public 'arena.'"

### 3.  Conclusion

Contemporaneously with Enzler's guilty plea, Dr. Smelko found him

competent.  Trial counsel believed Enzler was competent to proceed.  Dr. Zook did

not apply the correct legal standard, and the factual basis of her opinion is not compelling.  Viewed in light of the state court record, the allegations of Enzler's second amended petition do not suggest "a real possibility of constitutional error" and do not support an inference that Enzler was in fact incompetent when he pled guilty.  Enzler's first claim should be denied.

### B.  Ineffective Assistance of Counsel

Enzler also contends that his trial counsel were ineffective because they coerced his guilty plea.  This claim is more consistent with Dr. Zook's opinion that Enzler did not fully appreciate the consequences of his plea.  But rather than adding to the record of the case something previously unknown and material to the voluntariness of his plea, Enzler's allegations are contradicted by the record of the case.[5]

In his federal petition, Enzler points to a letter he wrote to his friend Kathleen in which he described trial counsel as "not able or doing any 'job' whatsoever."  He "wish[ed] someone would have worked on [his] case/defense,

---

[5] Enzler acknowledges this claim is procedurally defaulted.  He seeks to show cause to excuse his procedural default by alleging that postconviction counsel was ineffective for failing to claim that trial counsel was ineffective.  *See* Second Am. Pet. at 12–16; *Martinez v. Ryan*, 566 U.S. 1, 17 (2012); *Trevino v. Thaler*, 569 U.S. 413, 429 (2013); *see also, e.g.*, Order (Doc. 50) at 25–26, *Miller v. Kirkegard*, No. CV 13-13-GF-DWM-JTJ (D. Mont. May 20, 2015); *see also Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984) (defining two-prong test for ineffective assistance of counsel).  For the following reasons, the Court finds his claim lacks merit.  It would also be procedurally defaulted, but there is no need to consider the issue.

17

gotten ahold of those families." *See* Pet'r Ex. C (Doc. 13-4 at 167), *quoted in* Second Am. Pet. (Doc. 11) at 19.  He also claims counsel told him he could plead guilty "now and work to fix things later."  He concludes that he was "badgered and misled" into pleading guilty.  *Id.*

In mid-November 2011, a little over a month after he pled guilty, Enzler wrote to his attorneys, expressing his dissatisfaction with his situation but without suggesting they coerced him into the plea.  He said he lied "for this 'deal,'" that he "just want[s] the truth <u>out</u>, w/o embarassing [sic] the fam's/children in open court," and that he did not "care so much about the time as I am concerned with these kids lying + getting away with it."  He wanted counsel to find a way "to pull these adults aside" and "to pull judge aside," so "the truth" would "be known" but not made public.  *See* Pet'r Ex. C (Doc. 13-4 at 173–174).

Reasonable postconviction counsel could conclude Enzler did not want to withdraw his plea or go to trial.  Enzler accused counsel of apathy, not of coercing him or misleading him.  And, as explained above, several of Enzler's letters, written both before and after he pled guilty, show that he understood very well the gravity of the charges and the long-term consequences of his guilty plea.  Trial counsel testified that they believed Enzler was not interested in pleading guilty and so were preparing for trial when he told them he wanted to accept the State's plea offer.  *See* Evid. Hr'g Tr. at 116:23–117:19, 124:14–125:24, 131:24–132:24.

18

Finally, at sentencing, when Judge Sherlock deviated from the plea agreement, Enzler was given an opportunity to withdraw his plea. He expressed no interest in doing so. *See* Sentencing Tr. (Doc. 13-7) at 29:6–21, 31:8–22. Even now, Enzler does not allege he had a reasonable chance of acquittal on any charge at trial.

Faced with the necessity of standing trial or pleading guilty, Enzler pled guilty to limit his sentence. That is not coercion. *See Brady v. United States*, 397 U.S. 742, 750–51 (1970) (holding that guilty plea entered to avoid death penalty is not involuntary). And pleading guilty while continuing to protest his innocence to his friends does not demonstrate coercion either.

Enzler's post-plea letters expressing dissatisfaction with counsel's "work[]" on the case/defense" do not support an inference that trial counsel actually performed unreasonably or "badgered" him into a guilty plea. And even assuming counsel told Enzler he could plead guilty "and work to fix things later"—which is doubtful—the comment did not play a meaningful role in his decision to plead guilty. Enzler's many letters demonstrate that he knew there was no going back. Enzler's second claim should be denied.

## IV. Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules Governing § 2254 Proceedings. A COA should issue as to those claims on which the petitioner

makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

Few people would describe Enzler's letters or submissions to this Court as "mainstream."  He may have serious mental health issues now.  But the record of the criminal proceedings in state court gives no indication that he was not competent or that counsel coerced him into pleading guilty.  Contrary to his claim, Dr. Smelko evaluated his competency before he was sentenced.  And the record developed in postconviction proceedings does not support his claim of incompetence.  Enzler's expert witness did not apply the correct legal standard, and her characterization of his delusion is not consistent with his repeated statements recognizing the gravity and permanence of his guilty plea.  Enzler's allegation that counsel "badgered and misled" him into pleading guilty is similarly inconsistent with his own contemporaneous writings.

Reasonable jurists would find no basis to encourage further proceedings.  A COA is not warranted.

20

Based on the foregoing, the Court enters the following:

## RECOMMENDATION

1. Enzler's Second Amended Petition (Doc. 11) should be DENIED.

2. The Clerk of Court should be directed to enter by separate document a judgment in favor of Respondents and against Petitioner.

3. A certificate of appealability should be DENIED.

### NOTICE OF RIGHT TO OBJECT
### TO FINDINGS & RECOMMENDATION
### AND CONSEQUENCES OF FAILURE TO OBJECT

Enzler may object to this Findings and Recommendation within 14 days.[6] 28 U.S.C. § 636(b)(1). Failure to timely file written objections may bar a de novo determination by the district judge and/or waive the right to appeal.

DATED this 24th day of September, 2018.


 */s/ John Johnston*
John Johnston
United States Magistrate Judge

---

[6] As Enzler's counsel will be served via CM/ECF, he does not receive three additional days for mailing. *See* Fed. R. Civ. P. 6(d).

21